*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

WESTFIELD INSURANCE COMPANY,

        Plaintiff-Appellee,

v

SECURA INSURANCE and SECURA
SUPREME INSURANCE COMPANY,

        Defendants-Appellants.

UNPUBLISHED
February 7, 2019

Nos. 340622 & 341541
Saginaw Circuit Court
LC No. 15-027942-NF

Before: CAMERON, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

This consolidated appeal[1] involves a dispute between no-fault insurers regarding their respective liability to pay personal protection insurance benefits (PIP) for injuries suffered by Todd Loree and Christine Loree ("the Lorees") in a July 19, 2015 traffic accident involving their motorcycle and a motor vehicle. In Docket No. 340622, defendants, Secura Insurance and Secura Supreme Insurance Company, appeal by right from an order of judgment entered subsequent to a jury trial declaring them equal in priority to plaintiff, Westfield Insurance Company, with respect to the payment of no-fault benefits and ordering them to pay a 50/50 pro rata share of the Lorees' PIP benefits. On appeal, defendants challenge previous orders of the trial court denying their motion for summary disposition and their emergency motion to amend their answer. In Docket No. 341541, defendants appeal as of right from a November 28, 2017 stipulated order requiring them to pay plaintiff $39,539.23 in case evaluation sanctions pursuant to MCR 2.403(O).[2] We affirm.

---

[1] *Westfield Ins Co v Secura Ins*, unpublished order of the Court of Appeals, entered January 2, 2018 (Docket Nos. 340622, 341541).

[2] MCR 2.403(O)(1) provides that "[i]f a party rejects an evaluation and the action proceeds to verdict, that party must pay the opposing party's actual costs unless the verdict is more favorable to the rejecting party than the case evaluation."

## I. STATEMENT OF RELEVANT FACTS AND PROCEEDINGS

This case arises from a July 19, 2015 traffic accident at the intersection of Dixie Highway and Junction Road in Bridgeport, Michigan. According to plaintiff's version of events, their insured, Lana Kalmbach, approached the red light at the intersection in her Chevy Sonic and, failing to stop in time, rear-ended the Lorees, who were riding their Harley Davidson motorcycle. The impact pushed them into the vehicle stopped at the red light in front of them, a Dodge Caravan operated by defendants' insured, Melvin Braeutigam. The Lorees filed claims for first-party no-fault benefits with plaintiff, which plaintiff paid. Plaintiff then sought reimbursement on a pro rata basis from defendants on the ground that the Dodge Caravan ("the van") was involved in the accident. However, defendants informed plaintiff in a letter dated August 26, 2015, "Secura Insurance does not believe that our insured vehicle was actively involved in the accident in which your insured rear-ended the motorcyclists pushing them into our insured vehicle." Accordingly, defendants declined to consider a pro-rata split of PIP benefits. Subsequently, plaintiff filed an action in circuit court seeking, among other things, a declaration that defendants were equal in priority with plaintiff for the payment of PIP benefits and reimbursement from defendants of a pro rata share of the PIP benefits they had already paid.

Plaintiff deposed the witnesses to the accident in the spring and summer of 2016. No one testified to actually seeing the motorcycle hit the van or the motorcyclists hit the van prior to separating from their motorcycle. Todd Loree testified that he and his wife, Christine Loree, were riding Todd's 2008 Harley Davidson in the right-hand lane of southbound Dixie Highway when they came to a stop behind a van at a traffic light. The next thing he knew, he was picking himself up off the ground. He realized something had hit them, but he did not know what or from where, how many impacts there were, or where he had landed. He remembered getting up off the ground, walking to his wife, who was nearer the motorcycle than he was, and asking if she was all right. Everyone was yelling at him to stay down, so he lay himself back down beside his wife. When he did so, he was "next to the bike." Christine remembered being on the motorcycle and stopping behind a van at the intersection's traffic light. All she remembered beyond that was looking up at the sky from the cement, her husband coming to her, yelling for someone to call 9-1-1, a woman bringing her purse to her, and talking to an emergency medical technician inside the ambulance. She did not remember being hit, what hit them, where it came from, where she landed, or any damage done to the van or the motorcycle.

Melvin Braeutigam, operator of the van, testified that he was braking to stop at the red light at the intersection of Dixie Highway and Junction Road, when he looked in his rearview mirror and saw a maroon-colored motorcycle with two people on it slowing down behind him. As he came to a complete stop at the light, he was in the right-hand lane, and there were no vehicles in the lane to his left. He came to a full stop and waited at the light for approximately 15 seconds before something collided into the back of his van, causing him to feel a jolt. He opened the door and saw that the motorcycle was "just a little to the left of the vehicle." The man he assumed to be driving the motorcycle got up for a period before lying back down on the road, but the woman remained on the ground with her eyes closed, moaning. He described the position of the motorcycle as to the left of the driver's side, "a couple of feet ahead of [the rear end of the van, and] a little bit in the [left] lane." Melvin testified that the impact "caved in the

[van's] hatchback" and "did a number on the driver's side rear fender." He also saw a couple of scratches and a little maroon paint on the driver's side of the van.

Melvin's wife, Lucinda Braeutigam, was a passenger in the van at the time of the accident and testified consistently with her husband. She said they were in the right-hand lane next to the curb and first in line at the traffic light when "there was a big kaboom." After a moment, she exited the van, went around the front of it, and saw two people and their motorcycle on the ground next to the driver's side of the van. She said the two people were lying more toward the back of the van than the front of it, and their motorcycle was laying close to them, but not on top of them. Asked whether she knew if the motorcycle and the two individuals who were on it had run into some part of the van, Lucinda replied, "As far as I could tell, they came up the side, the driver's side. There was red paint on the driver's side and the motorcycle had red." She also observed a blue car with front-end damage; it was behind the van in the same lane, but "back further." Lucinda said that she did not witness the actual collision.

Kalmbach, operator of the Chevy that began the chain of events, testified that as she approached the intersection, she saw another vehicle stopped at the red light. She also saw the motorcycle, which she located ahead and two lanes to the left of her, in the intersection's left-turn lane. Kalmbach believed she applied her car's brakes as she approached the intersection, but did not stop in time and rear-ended the van, which then hit the motorcycle. Although this is what she thought happened, she admitted that she did not see what actually happened because her airbag deployed and obstructed her view. She disagreed with the diagram on the police report that showed the motorcycle sandwiched between her Chevy and the van, and insisted that she did not hit the motorcycle.

On October 31, 2016, defendants filed a motion for summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact, movant entitled to judgment as a matter of law) on the issue of whether the van was involved in the accident. They attached to their motion transcripts of the depositions of the witnesses to the accident showing that none of the witnesses testified to seeing the motorcycle hit the van. Defendants argued in their supporting brief that even if the motorcycle had hit the van, they were entitled to summary disposition nevertheless because there was no direct evidence that the Lorees were on the motorcycle when it hit the van. Plaintiff responded that the witnesses' deposition testimony and photographs of the damage to the van provided sufficient circumstantial evidence from which a jury reasonably could infer that the Lorees were on the motorcycle when it hit the van. Five days after filing its response to defendants' motion for summary disposition, plaintiff made essentially the same argument in its own motion for summary disposition pursuant to MCR 2.116(C)(10). Subsequent to hearing oral argument, the trial court denied both motions on the ground that neither party had "demonstrated the absence of a genuine issue of fact as to whether the injured motorcyclists made physical contact with the van."

Approximately a week before trial, plaintiff deposed Marie Efting,[3] the PIP claims adjustor for Secura Insurance who had informed plaintiff by an August 26, 2015 letter that defendants would not pay a pro-rata share of the Lorees' PIP benefits. During her deposition, Efting revealed that the final decision to decline to pay a pro rata share of the PIP benefits was based on a legal opinion obtained by her supervisor, Robert Gessler, and based on factual information about the accident that Gessler had submitted to the attorney. Consequently, plaintiff issued a subpoena for Gessler to appear at trial and for production or permission to inspect "[t]he complete unredacted PIP claims file regarding Todd and Christine Loree."

Defendants filed an emergency motion to quash the subpoena for Gessler and for the requested records. Plaintiff argued during the July 31, 2017 hearing on the motion that it was entitled to hear from Gessler the facts upon which defendants had based their denial of its request for a partial reimbursement of PIP benefits, especially if defendants' factual account of the accident differed from plaintiff's account. Defendants implied that the relevant facts were in the claims file, the non-privileged portions of which plaintiff had obtained during discovery. The trial court then observed, "Don't they [defendants] admit the factual allegations in their answer – that you have asserted in paragraphs eight and nine?"[4] The responses by the attorneys for both parties strongly suggest that this is the first time either had fully considered the implications of defendants' answer to the complaint. Plaintiff's attorney indicated that he thought defendants' admissions to the allegations in ¶¶ 8 and 9 of the complaint constituted judicial admissions and supported a finding that the Lorees were on the motorcycle when it made contact with the back of the van. He further stated his intent to ask the court to take judicial notice of the allegations and of defendants' admissions. Subsequent to the hearing, the trial court granted defendants' motion to quash.

At 8:49 a.m. the following morning, 11 minutes before the scheduled start of trial,[5] defendants e-mailed the court and plaintiff copies of an emergency motion for leave to amend their answer to ¶ 9 of plaintiff's complaint. Defendants stated that when they filed their answer, they thought it was true that the Chevy had hit the motorcycle and pushed it into the van, but through the course of discovery, they obtained information showing that there was no proof that the Lorees or their motorcycle had hit the van. For this reason, defendants sought to change their

---

[3] Efting was unavailable for the trial, and the deposition was videotaped.

[4] Plaintiff alleged in ¶ 8 of its complaint that Kalmbach "was operating a 2013 Chevy Sonic when she struck Todd and Christine Loree, who were operating a 2008 Harley Davidson motorcycle." In ¶ 9, plaintiff alleges that the impact between the Sonic and the motorcycle "pushed Todd Loree and Christine Loree into a 2009 Dodge Caravan that was being operated by Melvin Braeutigam and was insured with [defendants]." In their answer, defendants admit without qualification the allegations set forth in both paragraphs.

[5] Due to an administrative error, the prospective jurors who were supposed to be in court for voir dire that morning were not going to be there until the afternoon. Because neither party's attorney was available in the afternoon, the trial court rescheduled the start of trial for the following morning.

admission in ¶ 9 to a denial. The trial court denied defendants' motion as untimely and prejudicial.

The next morning, when the court had convened for the re-scheduled start of the trial, defendants moved the court to reconsider its denial of their emergency motion to amend. Defendants argued that whether the motorcycle and the Lorees had made contact with the van was the issue argued in the cross motions for summary disposition. The trial court had ruled that there was a genuine issue of material fact regarding whether the Lorees made contact with the van, defendants had relied on that ruling and, consequently, had seen no need or reason to amend their answer. Now that the court appeared to abandon that ruling, defendants needed to amend their answer. The trial court denied defendants' motion for reconsideration, again citing the extreme untimeliness of the motion. The trial proceeded, ending with the jury finding that the van was "involved in" the traffic accident with respect to both Todd and Christine Loree. On plaintiff's motion and without objections from defendants, the trial court entered an order on the judgment.

## II. ANALYSIS

### A. SUMMARY DISPOSITION

Defendants first contend that the trial court erred by denying their motion for summary disposition because the van was not "involved in" the accident for purposes of the no-fault act. Defendants stress that none of the witnesses to the traffic accident testified that he or she saw the motorcycle or the motorcyclists hit the van, and even if the motorcycle had hit the van, there was no evidence that the Lorees were still on the motorcycle when it hit. We disagree.

We review de novo a trial court's decision on a motion for summary disposition. *Auto Club Ins Ass'n v State Auto Mut Ins Co*, 258 Mich App 328, 331; 671 NW2d 132 (2003). Our review is limited to the evidence that had been presented to the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 476; 776 NW2d 398 (2009). We review the record in the same manner as the trial court to determine whether the movant was entitled to judgment as a matter of law. See *Morales v Auto-Owners Ins*, 458 Mich 288, 294; 582 NW2d 776 (1998).

Defendants moved for summary disposition pursuant to MCR 2.116(C)(10). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012). The moving party must specifically identify the matters that have no disputed factual issues, and has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. *Bronson Methodist Hosp v Auto-Owners Ins Co*, 295 Mich App 431, 440; 814 NW2d 670 (2012). A court must consider the evidence submitted in the light most favorable to the nonmoving party. *Joseph*, 491 Mich at 206. A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds could differ. *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013).

For a motorcyclist to be entitled to no-fault PIP benefits, the accident must involve a motor vehicle. *Auto Club Ins Ass'n*, 258 Mich App at 331 n 1. Pursuant to MCL 500.3114(5) and (6), which establish the order of priority for accidents involving motorcycles and motor vehicles,

> (5) A person suffering accidental bodily injury arising from a motor vehicle accident that shows evidence of the involvement of a motor vehicle while an operator or passenger of a motorcycle shall claim personal protection insurance benefits from insurers in the following order of priority:

> (a) The insurer of the owner or registrant of the motor vehicle involved in the accident.

> (b) The insurer of the operator of the motor vehicle involved in the accident.

> (c) The motor vehicle insurer of the operator of the motorcycle involved in the accident.

> (d) The motor vehicle insurer of the owner or registrant of the motorcycle involved in the accident.

> (6) If 2 or more insurers are in the same order of priority to provide personal protection insurance benefits under subsection (5), an insurer paying benefits due is entitled to partial recoupment from the other insurers in the same order of priority, together with a reasonable amount of partial recoupment of the expense of processing the claim, in order to accomplish equitable distribution of the loss among all of the insurers.

Defendants contend that the van was not "involved in" the accident for purposes of MCL 500.3114(5). Generally, if there is physical contact between the injured party and a vehicle, courts will consider that vehicle "involved in" the accident. See *Auto Club Ins Ass'n*, 258 Mich App 328 (2003) (holding that a motor vehicle is involved in an accident for purposes of MCL 500.3114(4) if a motorcyclist hits the vehicle before separating from the motorcycle). Defendants argue that, unlike the scenario in *Auto Club Ins Ass'n*, no one in the present case testified to actually seeing the motorcycle hit the van or to seeing the Lorees hit the van before separating from their motorcycle. Defendants err by overestimating the probative value of non-observance of an event and underestimating the probative value of circumstantial evidence with respect to the event in presenting a question of fact.

"The mere fact of non-[observance], standing alone, ordinarily has no probative value whatever as to the occurrence, or non-occurence [sic], of the event." *Dalton's Estate v Grand Trunk W R Co*, 350 Mich 479, 485; 87 NW2d 145 (1957). Thus, the party relying on negative testimony has the burden to

> show the circumstances pertaining to the non-observance, the witness' activities at the time, the focus of his attention, his acuity or sensitivity to the occurrence involved, his geographical location, the condition of his faculties, in short, all

-6-

those physical and mental attributes bearing upon his alertness or attentiveness at the time. [*Id*. at 485-486.]

Considering defendants' evidence in the light most favorable to plaintiff, *Joseph*, 491 Mich at 206, the negative testimony of the various witnesses had no probative value as to whether the Lorees hit the van. There is no evidence that the witnesses focused their attention on the accident at the time. Kalmbach assumed that the van hit the motorcycle, but she did not see the impact because her airbag deployed and obstructed her vision. Melvin Braeutigam saw the motorcycle pulling up behind him at the traffic light but did not recall seeing any other vehicle behind him. Viewed in the light most favorable to plaintiff, Melvin's testimony suggests that he was not looking behind him when the Chevy pulled up and rear-ended either him or the motorcycle. Nothing in Lucinda Braeutigam's testimony indicates that she was in a position to see whether the motorcycle hit the van, and the Lorees do not recall the details of the accident that left them with serious injuries. On this record, it cannot be said that defendants' negative evidence established that the Lorees did not hit the van while they were on their motorcycle.

Even if we assume for the sake of argument that defendants met their initial burden to establish the probative value of their negative evidence, the burden then shifted to plaintiff to show that a genuine issue of disputed fact did exist. See *Smith v Globe Life Ins Co*, 460 Mich 446, 455; 597 NW2d 28 (1999). Circumstantial evidence can present a genuine factual issue. *Bergen v Baker*, 264 Mich App 376, 387; 691 NW2d 770 (2004). In the present case, plaintiff relied on the deposition testimony of Melvin Braeutigam regarding seeing in his rear view mirror a maroon-colored motorcycle with two people on it slowing down behind him before the collision, feeling the collision jolt his van, observing subsequent damage to the back and left side of his van as well as the presence on the side of the van of maroon paint the same color as the motorcycle, and the post-impact location of the motorcycle near the back end of the van and close to the Lorees. Lucinda gave similar testimony to the post-collision location of the motorcycle and its riders, as well as to seeing paint on the van the same color as the motorcycle. In addition, Lucinda testified to her belief that the motorcycle and the Lorees "came up the side, the driver's side" of the van. The Lorees both testified to having come to a stop at the traffic light behind the van before the collision. Plaintiff also included in its brief scanned pictures of the damaged van. A jury could reasonably infer from this evidence that the motorcycle hit the van before the motorcyclists separated from it. Thus, plaintiff met its burden to show that a genuine issue of material fact existed that precluded summary disposition. Accordingly, the trial court did not err by denying defendants' motion for summary disposition.

## B. EMERGENCY MOTION TO AMEND ANSWERS

Defendants next argue that the trial court erred by denying its emergency motion to amend its answer to change their admission to paragraph nine of plaintiff's complaint to a denial. They contend that the requested amendment would not have prejudiced plaintiff because neither plaintiff nor the trial court relied on their admission during the course of this proceeding. They further contend that, even if their emergency motion to amend was unduly delayed, the remedy was not to deny the motion, but to order defendants to pay the expenses plaintiff incurred because of the undue delay. Again, we disagree.

A party may amend a pleading once as a matter of course if done within the limited period set forth in MCR 2.118(A)(1), which had long since passed in this instance. Otherwise, "a party may amend a pleading only by leave of the court or by written consent of the adverse party." MCR 2.118(A)(2). "Leave shall be freely given when justice so requires." *Id*.

A motion to amend ordinarily should be granted, and should be denied only for the following particularized reasons:

> "[1] undue delay, [2] bad faith or dilatory motive on the part of the movant, [3] repeated failure to cure deficiencies by amendments previously allowed, [4] undue prejudice to the opposing party by virtue of allowance of the amendment, [and 5] futility . . . ." [*Weymers v Khera*, 454 Mich 639, 658; 563 NW2d 647 (1997), quoting *Ben P Fyke & Sons, Inc v Gunter Co*, 390 Mich 649, 656; 213 NW2d 134 (1973).]

"Delay, alone, does not warrant denial of a motion to amend. However, a court may deny a motion to amend if the delay was in bad faith or if the opposing party suffered actual prejudice as a result." *Weymers*, 454 Mich at 659, citing *Fyke*, 390 Mich at 656-657. " '[P]rejudice' exists if the amendment would prevent the opposing party from receiving a fair trial, if for example, the opposing party would not be able to properly contest the matter raised in the amendment because important witnesses have died or necessary evidence has been destroyed or lost." *Weymers*, 454 Mich at 659.

The trial court found the motion extremely untimely and found that granting it would prejudice plaintiff. The court appeared to base its finding of prejudice primarily on the fact of the motion's untimeliness. In explaining to the trial court how granting the motion would prejudice plaintiff, plaintiff's attorney argued that defendants had acknowledged from the start "that the Lorees were pushed into" the van, that "[being] pushed into something means to make physical contact[,]"and that physical contact "is what this case is about."

A fair reading of the record leads to the conclusion that neither party appreciated the significance of defendants' admission until the trial court brought it up in the July 31, 2017 hearing on defendants' motion to quash the subpoena for Gessler. Defendants knew, or should have known, after all the witnesses had been deposed by the end of summer 2016 that there was no direct, eye-witness evidence that the motorcyclists hit the van, and thus, they should have moved to amend their answer much earlier than the day of the trial. To the extent that their failure to realize this and to act accordingly was due to carelessness, the trial court did not abuse its discretion by denying their motion for leave to amend. *Weyers*, 454 Mich at 660 (quoting with approval the observation of Judge John L. Coffey of the United States Court of Appeals for the Seventh Circuit that the latitude afforded parties in amending their pleadings " ' is not a license of carelessness or gamesmanship' ").[6] At the same time, plaintiff's insinuation that it

---

[6] Judge Coffey was referring to FR Civ P 15(a), but our Supreme Court has been guided by federal precedent in the interpretation of analogous rules of civil procedure. See *Weymers*, 454 Mich at 660 n 27.

was prejudiced because it somehow had relied on defendants' admission from the start of the litigation is unsupported by the record. For at least eight months before defendants filed their emergency motion to amend, the parties had vigorously disputed whether the Lorees had made contact with the van without plaintiff having once referred to defendants' admission to ¶ 9 of its complaint, alleging "that the Lorees were pushed into" the van. Thus, neither party was attentive to the import of their pleadings.

But, in addition to being untimely, defendants' motion also was not properly noticed and, arguably, made in bad faith. Whereas plaintiff indicated that it intended to ask the trial court to take judicial notice of the relevant paragraphs in the complaint and answer, defendants gave no indication at the July 31, 2017 hearing that they intended to seek leave to amend their answer. Defendants gave approximately 10 minutes' notice to plaintiff that they were seeking to amend their answer. Defendants said they based their motion for leave to amend on information obtained through discovery. However, what they discovered was the absence of information; specifically, the absence of an eyewitness to the motorcyclists hitting the van. As discussed above, negative testimony can have probative value where the witness's non-observance results from the witness's focused attention on the event. As already indicated, such was not the case here; defendants based their denial on the testimony of people who were not, or were not able to, pay attention to the collision in order to see exactly what happened. Because defendants based their proposed amendment on negative evidence without probative value, their proposed denial would arguably be a bad-faith denial.[7] Given the untimeliness of defendants' motion and the lack of probative evidence upon which to base a reversal of their previous admission to the allegation that the Chevy pushed the Lorees into the van, we cannot say that the trial court abused its discretion by denying defendants' motion for leave to amend.

Even if the trial court did abuse its discretion by denying defendants' motion for leave to amend, this Court will not reverse unless the trial court's decision constituted "an abuse of discretion that resulted in injustice." *PT Today, Inc, v Comm'r of Office of Fin & Ins Servs*, 270 Mich App 110, 142; 715 NW2d 398 (2006). Defendants have not argued that the trial court's decision resulted in an injustice. Defendants' theory was that plaintiff's evidence was insufficient to prove its claim that defendants' insured was involved in the accident. At trial, defendants' attorney cross-examined plaintiff's witnesses vigorously, established the lack of direct evidence that the motorcyclists hit the van, and urged the jury to consider ¶ 11[8] of the answer, which conveyed defendants' position that their insured was not involved in the accident.[9] Defendants challenged plaintiff's evidence, but the jury chose to infer from the

---

[7] A bad-faith denial is a denial without grounds. *Black's Law dictionary* (10th ed), p 527.

[8] In ¶ 11 of its complaint, plaintiff alleges that defendants refused to partially reimburse it for no-fault PIP benefits paid to the Lorees "as a result of injuries sustained in the July 19, 2015, multiple vehicle accident . . . ." Defendants admit their refusal, but "deny that there were multiple motor vehicles involved in this accident. Further state that the insured of the defendant was not involved in the accident as defined under Michigan law."

[9] The trial court took judicial notice of the entire complaint and answer, not just ¶¶ 8 & 9.

evidence presented that the van was involved in the accident with regard to both Lorees. The record as a whole does not support a finding that the trial court's decision regarding defendants' motion for leave to amend should be reversed based on an injustice to defendants.

Because defendants have not prevailed on either issue in Docket No. 340622, which thus leaves the jury verdict intact, they are not entitled to reversal of the trial court's order imposing case evaluation sanctions, their contingent issue raised in Docket No. 341541.

Affirmed.


/s/ Thomas C. Cameron
/s/ Jane M. Beckering
/s/ Amy Ronayne Krause